**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ashley Murray, *et al.*, | No. CV-19-08021-PCT-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Ashford TRS Sapphire VI LLC, *et al.*, | |
| Defendants. | |

At issue is Defendant Centimark's Motion for Summary Judgment (Doc. 107, Centimark MSJ), to which Plaintiffs Ashley Murray, Randy Blankenchip, Susan Blankenchip, and Larence Murray as well as Co-Defendants Ashford TRS Sapphire VI, LLC d/b/a Embassy Suites by Hilton Flagstaff, Ashford Flagstaff, LP, Ashford Sapphire VI GP, LLC, Remington Lodging & Hospitality, LLC, Hilton Franchise Holding, LLC d/b/a Embassy Suites and Embassy Suites by Hilton, Hilton Domestic Operating Company, Inc., and Hilton Worldwide Holdings, Inc. (collectively "Hotel Defendants") filed Responses (Doc. 113, Pls.' Resp. to Centimark MSJ) (Doc. 115, Hotel Defs.' Resp.), and Centimark filed Replies. (Doc. 121, Centimark Reply HD) (Doc. 123, Centimark Reply Pls.). Centimark also filed a Notice of Supplemental Authority (Doc. 139) and Plaintiffs filed a Response (Doc. 140).

Also at issue is the Hotel Defendants Motion for Partial Summary Judgment (Doc. 133, HD MPSJ), Plaintiffs' Response (Doc. 135, Pls.' Resp. to HD MPSJ), and the Hotel Defendants' Reply (Doc. 138, HD Reply). The Court finds these matters appropriate

for decision without oral argument. *See* LRCiv 7.2(f). For the reasons that follow, the Court will deny both motions in their entirety.

## I. BACKGROUND

As an initial matter, the Hotel Defendants own and operate the Embassy Suites Hotel property located at 706 South Milton Road, Flagstaff, Arizona (the "Hotel"). (Hotel Defendants Statement of Facts to MPSJ ("HDSOF-MPSJ") ¶ 3.)

On November 4, 2016, Mr. Ebner, a Centimark employee, visited the Hotel and submitted a proposal bid to repair the leaks on its roof. The proposal stated that Centimark would repair the uncapped roof vent in the "Leak 4" roof area by reinstalling the vent cap that had blown off, which the Hotel had onsite. (Centimark Statement of Facts ("CSOF") ¶ 10, Ex. D.) Mr. Ebner knew at the time he submitted the proposal that the vent cap was designed to allow ventilation from the building. (CSOF ¶ 13; Plaintiffs Separate Statement of Facts - Centimark ("PSSOF - Centimark") ¶ 1, Ex. 6. at 63:23-64:3.)

There are multiple factual disputes over Centimark's knowledge of the vent's function and utility as well as the sequence of events after Centimark installed the vent cap. However, the parties agree that on May 24, 2017, the Hotel and Centimark signed a contract incorporating the terms of the proposal bid, which called for Centimark to reinstall the vent cap that the Hotel had on site. (CSOF ¶ 15.) However, days before Centimark was supposed to start work, Mr. Hector, the Hotel's engineer, could not locate the vent cap (CSOF ¶ 18.) When Centimark started work at the Hotel on June 21, 2017, the parties had preliminary discussions about how to replace the vent cap, including that Mr. Hector might purchase a new vent cap from Boyer Mechanical or Centimark could manufacture one, but never reached a conclusion. (Hotel Defendants Controverting Statement of Facts ("HDCSOF") ¶ 30, Ex. 3 at 50:13-51:4, 177:6-11.) Offsite, Mr. Terranova, another Centimark employee, informed Mr. Ebner that Centimark had two options: either 1) "do a regular vented cap like the one that had blown off," or 2) do a temporary cap, similar to what Centimark ultimately decided.[1] (PSSOF - Centimark ¶ 10, Ex. 6 at 65:21-67:18, 93:13-95:2.) Mr. Ebner

---

[1] Mr. Terranova has since passed away.

instructed Mr. Terranova to go to the worksite and discuss the options before Centimark took further action. However, Mr. Terranova never visited the site, and instead, instructed Mr. Garcia and the crew onsite to manufacture a temporary cap for the pipe. (PSSOF - Centimark ¶ 4, Ex. 11 at 89:11-19, Ex. 7 at 19:22-24, 69:7-10.) Mr. Garcia manufactured the cap, which was not properly ventilated, out of extra sheet metal and installed it. (PSSOF - Centimark ¶ 11, Ex. 7 at 23:13-25:5, 41:21-45:15.)

Once the Centimark crew completed their work on June 23, 2017, Mr. Garcia called Mr. Hector, who was not at the Hotel, to inform him that they had manufactured and installed a new vent cap. (CSOF ¶ 32, Ex. H at 73:2-14.) Centimark contends that Mr. Garcia then waited until Mr. Hector returned to the Hotel and showed him the newly installed cap. (CSOF ¶ 30, Ex. G at 46:9-47:25.) Hotel Defendants and Plaintiffs aver that Mr. Garcia never brought Mr. Hector to the roof; rather, Centimark left the Hotel before Mr. Hector returned. (HDCSOF ¶ 30, Ex. 3 at 72:22-74:3.)

Each party provides different facts regarding Mr. Hector's access to the roof once he returned to the Hotel. Centimark contends that Mr. Hector knew that it did not install a proper vent cap and could have easily checked the roof using the lift that Centimark left on the jobsite to gain roof access. (CSOF ¶ 32, Ex. H at 139:8-18.) Plaintiffs appear to contend that Mr. Hector did not even need the lift; rather he could have viewed the temporary vent cap by simply walking 50 feet from his office. (Plaintiffs' Separate Statement of Facts to Hotel Defendants MSJ ("PSSOF-HD") ¶ 11, Ex. 6 at 180:18-21.) Finally, Hotel Defendants contend that Mr. Hector did not have access to the roof and thus did not have the ability to check Centimark's work. (HDSOF-MPSJ ¶ 22, Ex. H at 50:18-51:13, 74:3, 109:1-4, 164:7-16.)

Plaintiffs stayed overnight at the Hotel on June 26, 2017. Upon leaving the next morning, Plaintiffs reported feeling sluggish and tired. Later that day, the Flagstaff Fire Department discovered elevated levels of carbon monoxide within the Hotel. When they removed the vent cap that Centimark had installed, the carbon monoxide levels returned to normal. The hotel informed Plaintiffs that their room had elevated carbon monoxide levels,

and Plaintiffs were eventually diagnosed with carbon monoxide poisoning. (CSOF ¶¶ 3-5, Ex. A ¶¶ 32-33.). Although the Flagstaff Fire Code requires hotel rooms to have carbon monoxide detectors, Plaintiffs' room was not equipped with one.

Plaintiffs subsequently brought claims for negligence and punitive damages against Hotel Defendants and Centimark in connection with their alleged carbon monoxide poisoning. Centimark now moves for summary judgment on all of Plaintiff's claims, arguing that it did not owe a duty to the Plaintiffs and that punitive damages are not warranted. Separately, the Hotel Defendants move for partial summary judgment on the issue of punitive damages for specific actions alleged in Plaintiffs' Complaint.

## II.  LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. The non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a question of material fact. *Anderson*, 477 U.S. at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

"A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

### III. ANALYSIS

#### A. Duty

Centimark argues that it cannot be liable to Plaintiffs for negligence because it did not owe them a duty while working on the Hotel's roof vent. "While the existence of a duty is a question of law for the court, *see Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007), that inquiry does not operate in a factual vacuum." *Monje v. Spin Master Inc.*, CV-09-1713-GMS, 2013 WL 2390625 at *13 (D. Ariz. May 30, 2013). "Instead, the relationships between the parties and their respective roles in the underlying injury shape the analysis." *Id.*

#### 1. Restatement (Second) of Torts § 324A

Arizona follows Restatement (Second) of Torts § 324A, which states that an independent contractor may owe a duty to third parties when rendering services to another under the following circumstances:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

To find that Centimark owed Plaintiffs a duty pursuant to Section 324A, Plaintiffs would need to show that: 1) Centimark should have recognized its work as necessary for the protection of the hotel patrons; and 2) under subsection (b), Centimark undertook to perform the Hotel Defendants' duty to keep the hotel patrons safe. Centimark argues that summary judgment is warranted because the undisputed facts show that its only job was to prevent the roof from leaking and thus "nothing about the Roof Vent Cap Work had anything to do with providing for Plaintiff's safety." (Centimark MSJ at 10.) Plaintiffs counter that Centimark's responsibility was the maintenance of a Hotel flue venting boiler, which Centimark should have known was necessary for the safety of the hotel patrons, including Plaintiffs. (Pls.' Resp. to Centimark MSJ at 13.)

Centimark first cites the contract between Centimark and Hotel Defendants, contending that Centimark was only hired to prevent leaks on the Hotel's roof. (Centimark MSJ at 9.) However, the contract is not dispositive of Centimark's responsibilities, as it merely called for Centimark to reattach the existing vent cap. Once Centimark decided to manufacture and install its own vent cap, it clearly exceeded the contract's scope.[2] However, this alone does not mean that Centimark should have recognized that its services were necessary for Plaintiffs' protection. If Centimark thought, for example, that it was applying the new vent cap to a harmless pipe that did not need to be ventilated, then it arguably would not have reason to recognize that its services were necessary for the safety of a third party.

Therefore, the real questions are whether Centimark knew that it was working on an active boiler vent and thus that the vent cap needed to be properly ventilated. The maintenance and proper ventilation of an active boiler vent, as evidenced by this very case,

---

[2] Centimark's citation to *Easter v. Percy*, 810 P.2d 1053 (App. 1991) illustrates its misplaced focus on the scope of its initial responsibilities. In *Easter*, the court held that Section 324 did not apply to engineers who were allegedly negligent when inspecting a general contractor's work that resulted in injury to the plaintiff, stating that "since the services – inspection for compliance with the plans – were not undertaken for reasons of safety, the argument that the defendants should have recognized that they were necessary for the safety of a third person is weak." *Id.* at 1056. Centimark argues that this case is analogous because Centimark also did not contract with Embassy Suites for work that initially implicated a third party's safety. Here, however, there is ample evidence that the construction and installation of a new vent cap exceeded the initial scope of the contract.

- 6 -

1    is a service that is necessary for the protection of a third party. Examining the evidence,
2    the Court finds that there is a material conflict of fact as to what Centimark knew about the
3    function and utility of the vent.
4        First, Centimark employees' own deposition testimony illustrates that they knew
5    that they were capping a boiler exhaust pipe and that the cap they were replacing was
6    specifically designed to release potentially harmful substances from the building through
7    the roof. Mr. Ebner testified that when examining the roof prior to submitting his proposal,
8    he examined the vent as well as the vent cap and understood that the venting was to
9    "ventilate the item from the roof" as well as "release whatever air, gas, from the building,"
10   and that "whatever that pipe or cap is attached to is what it's ventilating." (PSSOF –
11   Centimark ¶ 1, Ex. 6 at 57:3-4, 63:18-64:3.). Likewise, Mr. Garcia testified that
12   Centimark's responsibility for "Leak 4" was to "Re-install one equipment curb cap that
13   blew off," which is "a lid that allows air to vent out of the building, and that he understood
14   that the vent Centimark worked on was a boiler exhaust vent pipe (PSSOF – Centimark
15   ¶ 16, Ex. 7 at 18:2-16; 21:12-17.) Furthermore, Mr. Terranova told Mr. Garcia that it was
16   important that the manufactured vent cap would provide proper ventilation. (PSSOF –
17   Centimark, Ex. 7 at 28:14-20.) This evidence illustrates that when Centimark decided to
18   manufacture a replacement cap, it understood, or should have understood, that it needed to
19   be properly ventilated and not doing so could cause hotel patrons to be exposed to
20   potentially harmful substances.
21       Centimark does not directly acknowledge its employees' testimony in its briefing.
22   It instead argues that Centimark employees were not expressly told that the vent was an
23   active boiler vent and cites Mr. Garcia's testimony that he never felt hot air as he installed
24   the cap. However, Mr. Hector provided detailed testimony at his deposition that based on
25   the timing of Centimark's work, the laundry machines and showers at the hotel would have
26   been consistently running and thus powerful hot air would have been exuding from the
27   boiler vent as Centimark installed the vent cap. (Hotel Defendants' Statement of Facts in
28   Response to Centimark MSJ ("HDSOF Resp.") ¶ 1, Ex. 3 at 117:2-122:5.) Because

Mr. Hector was not present while Mr. Garcia installed the vent cap, his testimony alone may not have been sufficient to avoid summary judgment. However, combined with Mr. Garcia's testimony that he knew he was working on a boiler exhaust vent pipe as well as the testimony of Mr. Ebner and Mr. Terranova, it is sufficient to create an issue of fact as to Centimark's knowledge of the function and utility of the vent.

Based on this evidence, there are disputes of the material facts underlying whether Centimark owed Plaintiff a duty pursuant to Section 324. If Centimark knew or should have known that the cap it manufactured needed to be ventilated because the vent was active and potentially releasing harmful substances, it then follows that it knew its services in manufacturing and installing it were necessary for the safety of the third party hotel patrons and thus owed them a duty to ensure that the manufactured cap was properly ventilated. *See Haines v. Get Air Tucson Inc.*, 15-CV-00002-TUC-RM (EJM), 2018 WL 5118640 at *3 (D. Ariz. Oct. 22, 2018) (holding that Section 324A applied where plaintiff produced sufficient evidence that defendant provided services that were necessary for third party's safety); *Oto v. Airline Training Center Arizona, Inc.*, 247 F. Supp. 3d 1098 (D. Ariz. 2017). In *Oto*, the decedents of the victims killed when a pilot intentionally crashed a plane sued the pilot training school that that had trained the pilot for negligence in failing to monitor his mental health conditions. The pilot training school argued that the only duty it had was to train pilots to fly, not to investigate their mental state. The Court held that this was too narrow a view of the school's responsibilities and it was not beyond its scope of responsibility to ensure that the pilots it trained were mentally qualified to fly, particularly where the school knew or should have known about the pilot's struggles with mental health. *Id.* at 1106.

The evidence likewise distinguishes this case from the Arizona Supreme Court's recent decision in *Dabush v. Seacret Direct LLC*, 478 P.3d 695 (Ariz. 2021), which Centimark submitted in its Notice of Supplemental Authorities (Doc. 146). There, the roofing contractor was hired to stop leaks by repairing skylights on the roof. After Plaintiff checked on the skylight being worked on, he went over to a different skylight 80 feet away,

stepped on it, and fell through. *Id.* at 697-98. The court held that Section 324 did not apply, explaining that by agreeing to repair the leaks on the roof, the contractor did not take on a duty to prevent plaintiff from falling through the skylight. *Id.* at 704. These facts are distinguishable from the case at hand. First, in *Dabush*, the defendant had not worked on the skylight that plaintiff fell through, which, as the court emphasized, was 80 feet away from where they were working. Second, although in both cases defendants were hired to repair a leak on the roof, Centimark exceeded the scope of the contract by manufacturing a new vent cap. There is no indication that defendant in *Dabush* exceeded the scope of its contract in any such way.

Centimark's contention that subsection (b) does not apply rehashes many of the same arguments.[3] It acknowledges that Hotel Defendants owed Plaintiffs a duty of care to

---

[3] The Court declines to address Centimark's arguments on Plaintiff's and Hotel Defendants' alternate theories of duty. However, the Court will briefly discuss whether Centimark may potentially owe a duty under subsection (a) of Section 324 due to its "failure to exercise reasonable care increas[ing] the risk of… harm" to the hotel patrons. While no party sufficiently briefed the issue, Centimark's MSJ addressed subsection (a) in a footnote, dismissing it as "contrary to Arizona law" because *Quiroz v. ALCDOA Inc.*, 416 P.3d 824 (Ariz. 2018) rejected "risk creation" as a basis for duty." (Centimark MSJ at 9 n. 2.)

The Hotel Defendants appear to base their Section 324A argument on subsection (a), writing that "the Restatement (Second) of Torts, §324A establishes a special relationship between one who performs services [Centimark] for another [Hotel Defendants] to third persons [Plaintiffs] for physical harm resulting from its failure to exercise reasonable care if that failure increase[s] the risk of harm to others." (Hotel Defendants Resp. at 6.) However, they failed to address Centimark's assertion that subsection (a) is contrary to Arizona law. The Court also notes that Hotel Defendants misquoted the first part of 324A, which requires both that the party performs services for another and that the performer of services recognize that those services are "necessary for the protection of a third person." Restatement (Second) of Torts, §324A.

The Court finds that *Quiroz* alone does not render Section 324A(a) contrary to Arizona law. The case did establish that risk creation by itself could not be a basis for duty; however, the court in *Quiroz* did not opine on whether creation of the risk could be a partial basis for duty. *Quiroz* was concerned that if risk creation was the entire basis for duty, it would create a "presumed duty of care owed by all people at all times," which would unmanageably expand tort liability while also merging duty with the element of causation. *Id.* at 840-41. Under Section 324A(a), that is not an issue. As discussed above, there are two elements to 324A(a). In order for subsection (a) to apply, the Court must find both that the defendant's actions increased the risk for a third party, and that he performed services for another that defendant understood were necessary for the third party's protection. This second requirement ensures that Section 324A(a) will not cause *Quiroz's* concerns about limitless tort liability to be realized.

Importantly, the Arizona Supreme Court did not expressly state that its holding in *Quiroz* dictated that 324A(a) was contrary to law and has previously cited it as the basis for finding

- 9 -

provide them with a safe room but argues that the vent cap work had nothing to do with Plaintiffs' safety. As discussed *supra*, Plaintiffs and Hotel Defendants have proffered sufficient evidence at the summary judgment stage that Centimark's work was directly related to Plaintiff's safety and thus Centimark took on the duty pursuant to Section 324A(b) to ensure that Plaintiff's room was safe from exposure to carbon monoxide.

### 2.   Accepted Work Rule

Centimark further argues that even if it had a duty under Section 324A, that duty is nullified based on the accepted work rule. The accepted work rule states that "a contractor is not liable for injuries sustained by a third person once the work has been completed and accepted by the owner of the project." *L.H. Bell & Assocs. v. Granger*, 543 P.2d 428, 433 (Ariz. 1975). Importantly, however, the rule only applies when "the contractor has no discretion and is merely following the plans and specifications provided by its employer." *Id.*

The Court cannot find as a matter of law that the accepted work doctrine applies where, as here, there are issues of material fact as to whether Centimark exercised discretion as well as if Mr. Hector accepted Centimark's work. Centimark argues that it simply followed the contract and thus did not exercise discretion when capping the vent. However, in order to fulfill its contractual duty to prevent leaks, Centimark exercised discretion in multiple ways, including deciding to manufacture a new vent cap. Indeed, Mr. Ebner acknowledged that the manufacture and installation of a new vent cap went beyond the scope of Centimark's agreed upon responsibilities, and Centimark has not produced evidence that it informed Mr. Hector of its decision until after it had already installed the new vent cap. (PSSOF – Centimark PSOF ¶ 3, Ex. 6 at 93:17-94:14.)

Moreover, the parties dispute whether Mr. Hector accepted Centimark's work. Centimark concedes that Mr. Hector's testimony that Mr. Garcia never showed him the

---

that defendant owed plaintiff a duty. *See Stanley v. McCarver*, 208 92 P.3d 849, 853-54 (Ariz. 2004). And, *Haines*, which was decided after *Quiroz*, cited Section 324A(a) as a basis for the defendant's duty. 2018 WL 5118640 at *3 (explaining defendant potentially owed plaintiff a duty because defendant's failure to exercise reasonable care "increased the risk of harm").

installed vent cap creates an issue of fact as to actual acceptance. But it argues that the standard for the accepted work rule is "practical acceptance" of the work, which "generally occurs when the work is completed, exclusive possession and control of the property and the work is returned to the property owner, and the property owner is thus restored to be in best position to be able to prevent others from being injured by the work." (Reply to Hotel Defendants at 9-10.) However, in support of this proposition, Centimark only cites *Bromaghim v. Furney*, 808 A.2d 615, 617 (R.I. 2002). Arizona law controls this case and the Court declines to grant summary judgment on such an important issue based on a different state's interpretation of the accepted work rule. Furthermore, it does not appear that *Bromaghim* is discussing the accepted work rule as it applies to this case. Rather, the issue before the court was whether defendant homeowners were liable to the injured plaintiff for a mistake an independent contractor made when installing steps. *Id.* at 617.

For these reasons, Centimark's Motion for Summary Judgment on the issue of duty is denied.

**B.    Centimark's Motion for Summary Judgment on Punitive Damages is Denied**

The Court will also deny Centimark's Motion for Summary Judgment on punitive damages. Summary judgment on the question of punitive damages is inappropriate if "a reasonable jury could find the requisite evil mind by clear and convincing evidence." *Thompson v. Better–Bilt Aluminum Prods. Co.,* 832 P.2d 203, 211 (Ariz. 1992). In determining whether a defendant exhibited an "evil mind," courts consider "the nature of the defendant's conduct, including the reprehensibility of the conduct and the severity of the harm likely to result, as well as the harm that has occurred [in addition to] [t]he duration of the misconduct, the degree of defendant's awareness of the harm or risk of harm, and any concealment of it." *Id.* at 556. The primary question where punitive damages are concerned is motive, because gross negligence and reckless disregard are not enough. *Volz v. Coleman Co., Inc.,* 748 P.2d 1191, 1194 (Ariz. 1987). Because defendants rarely admit to an "evil mind," improper motive is often inferred from sufficiently

oppressive, outrageous, or intolerable conduct as well as defendant's conscious and deliberate disregard of the interest and rights of others. *Id.*

Centimark's motion relies on characterizing many of the same facts from the duty section as undisputed. Therefore, the Court will only briefly discuss why those facts are disputed and Centimark's motion must accordingly be denied. Centimark argues that it is undisputed that Mr. Garcia did not know that he was repairing an active boiler vent or what purpose the vent cap served (Centimark MSJ at 13-14.); however, this is disputed by Mr. Garcia's own testimony, the testimony of Mr. Hector, and evidence that other Centimark employees were aware of the vent cap's purpose. (PSSOF – Centimark ¶¶ 1, 16, Ex. 6 at 57:3-4, 63:18-64:3, Ex. 7 at 18:2-16; 21:12-17; HDSOF Resp. ¶ 1, Ex. 3 at 117:2-122:5.) Indeed, Mr. Garcia testified that Mr. Terranova told him that the manufactured cap should be ventilated. (PSSOF – Centimark, Ex. 7 at 28:14-20.) Centimark further contends that Mr. Hector approved of and accepted the work, but that is likewise disputed. (PSSOF – Centimark ¶ 19, Ex. 11 at 50:18-51:13, 72:22-74:3, 164:7-16.) Because the Court has determined that there are multiple disputes of material fact that are dispositive to the issue of punitive damages, Centimark's MSJ is denied.[4]

### C. Hotel Defendants' Motion for Summary Judgment on Punitive Damages is Denied.

Likewise, the Court will deny Hotel Defendants' Motion for Partial Summary Judgment on portions of Plaintiffs' claim for punitive damages. The Hotel Defendants' motion outlines three of Plaintiffs' theories of negligence: 1) Mr. Hector inspected Mr. Garcia's work, saw that he had flat capped the vent, and did not attempt to remedy the situation; 2) Mr. Hector failed to inspect Mr. Garcia's work; and 3) Hotel Defendants did not install carbon monoxide detectors, which violated the Flagstaff Fire Code and put

---

[4] Importantly, the Court's denial of Centimark's MSJ on punitive damages does not definitively mean that punitive damages are warranted if theses factual disputes are resolved in Plaintiff's favor. There is of course the possibility that Centimark's conduct still would not rise to the level needed for punitive damages as a matter of law. However, Centimark did not make that argument and thus that issue is not before the Court at this time. A jury will have the opportunity to settle fact disputes and based on jury instructions, determine whether Centimark's conduct warrants punitive damages.

Plaintiffs in danger. The Hotel Defendants acknowledge that Mr. Garcia's testimony that he showed Mr. Hector the installed cap creates a genuine dispute of a material fact on the first theory, which precludes summary judgment. However, they contend that they cannot be liable for punitive damages for the conduct alleged in Plaintiffs' two other theories of negligence.

Hotel Defendants first argue that if the jury concludes that Mr. Hector did not actually inspect Centimark's work, his failure to inspect would at most be simple negligence because there is no evidence that Mr. Hector should have known that Centimark employees had installed an unventilated cap. (HD MPSJ at 6.) This argument fails for multiple reasons. First, there are other relevant issues besides Mr. Hector's actual knowledge that Centimark installed an unventilated cap. Mr. Hector's testimony, if credited by the finder of fact, could illustrate that he never informed Centimark that they were working on an active boiler vent, knew that Centimark was considering manufacturing its own vent cap, knew or should have known that Centimark was not licensed to manufacture and install a vent cap on an active boiler vent, and did not believe that Centimark could have manufactured a proper vent cap. (PSOF-HD ¶¶ 9, 10, Ex. 6 at 53:8-12, 73:10-14, 111:12-114:15, 177:3-11; CSOF ¶ 32, Ex. H at 137:24-138:2.) In fact, Mr. Hector was in the process of obtaining a properly vented cap from a different company when Mr. Garcia informed him that Centimark had manufactured and installed one instead, and he testified that he was "ticked off" that Centimark had left before he returned to the Hotel because he could not check Centimark's work. (PSSOF – Centimark ¶ 19, Ex. 11 at 50:18-51:13, 72:22-74:3.) This too is disputed, as there is ample evidence that Mr. Hector had multiple ways to access the roof.[5] (PSOF-HD ¶ 11, Ex. 6 at 180:18-21.)

In arguing that anything short of Mr. Hector's direct knowledge of the unventilated cap is insufficient for punitive damages, Hotel Defendants only cite Arizona's standard for punitive damages and then contend that the evidence of their conduct did not meet that

---

[5] Mr. Hector denies that he could have used the lift and testified that he did not know about the spot 50 feet from his office; however, these are disputed facts that are resolved in favor of the non-moving party. *Celotex Corp*, 477 U.S. at 322–23.

standard. However, they do not directly address any of the aforementioned evidence or cite to case law with analogous fact patterns where courts found that defendants' conduct did not warrant punitive damages. The Court declines to grant summary judgment on such an important issue without any supporting case law or a proper discussion of the evidence at hand.

Similarly, Hotel Defendants dedicate one paragraph to argue that the failure to install carbon monoxide detectors in the hotel rooms at most constitutes simple negligence but do not provide case law to support their argument. Instead, Hotel Defendants cite one line from Plaintiff's expert report to show that the lack of carbon monoxide detectors was only simple negligence. *See* HD MPSJ at 7 (quoting the expert report as stating that the lack of carbon monoxide detectors was "an example of their failure to take reasonable care"). The Court is not convinced. Plaintiffs have proffered evidence that Hotel Defendants' failure to install carbon monoxide detectors was in violation of Flagstaff Fire Code, as well as that a high-level employee of Hotel Defendants knew of the serious danger that carbon monoxide posted to hotel patrons. (HDSOF-MPSJ ¶ 26; PSOF-HD ¶ 4, Ex. 5 at 30:21-31:25.) Importantly, Darin Sharkey, the Hotel Defendants' Vice President of Engineering, acknowledged that functioning carbon monoxide detectors would have alerted Plaintiffs to the carbon monoxide exposure. (PSOF-HD ¶ 11, Ex. 6 at 180:18-21.) Hotel Defendants argue in their Reply that they were unaware of the Flagstaff Fire Code and that there is insufficient evidence that Hotel Defendants understood the dangers of carbon monoxide poisoning. (Reply at 5.) These arguments at most create a dispute as to a material fact, as Hotel Defendants provide no analogous case law to illustrate that the evidence is insufficient or that their alleged conduct does not meet the standard for punitive damages. The Court sees no reason why the jury should not hear the evidence from all parties, particularly where there are issues of material fact as to the Hotel Defendants' knowledge of the dangers of carbon monoxide. At the conclusion of the parties' presentation of the evidence, Hotel Defendants may move to exclude punitive damages under Fed. R. Civ. P. 50. But at this stage, and without the benefit of supporting case law,

Hotel Defendants have not shown that a reasonable jury could not find by clear and convincing evidence that their failure to install carbon monoxide detectors was a conscious disregard for the safety of their patrons.

**IT IS THEREFORE ORDERED** denying Defendant Centimark's Motion for Summary Judgment Re: Duty (Doc. 107);

**IT IS FURTHER ORDERED** denying Defendant Centimark's Motion for Summary Judgment Re: Punitive Damages (Doc. 107);

**IT IS FURTHER ORDERED** denying Defendants Ashford TRS Sapphire VI, LLC d/b/a Embassy Suites by Hilton Flagstaff, Ashford Flagstaff LP, Ashford Sapphire VI GP, and Remington Lodging & Hospitality, LLC Motion for Partial Summary Judgment Re: Punitive Damages (Doc. 133);

**IT IS FURTHER ORDERED** that Plaintiffs' claims will proceed to trial, and the Court will set a pre-trial status conference by separate Order.

Dated this 31st day of March, 2021.

_____
Honorable John J. Tuchi
United States District Judge